IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CMFG LIFE INSURANCE COMPANY,
CUMIS INSURANCE SOCIETY, and
MEMBERS LIFE INSURANCE COMPANY,

                Plaintiffs,

v.

CREDIT SUISSE SECURITIES (USA) LLC,

                Defendant.

OPINION and ORDER

14-cv-249-wmc

---

Having lost millions of dollars in transactions related to residential mortgage backed securities ("RMBS"), the plaintiffs here seek to rescind purchases of twelve separate RMBS certificates from defendant Credit Suisse Securities (USA) LLC ("Credit Suisse").[1] Before the court is defendant's motion for partial summary judgment, seeking judgment in its favor as to: (1) an RMBS certificate that Credit Suisse sold to plaintiffs but did not issue or underwrite; (2) any rescission claim based on statements that aggregated loan data is "actually false"; and (3) the appropriate method for calculating prejudgment interest. For the reasons explained below, the court will grant in part and deny in part the motion.[2]

---

[1] The court previously granted defendant's motion to dismiss plaintiff's rescission claim as to one other RMBS certificate. (Dkt. #79.)

[2] The cover page of defendant's motion and of its supporting briefs each include the phrase "oral argument requested," but in light of the parties' briefs and supporting submissions, the court finds oral argument unnecessary.

UNDISPUTED FACTS[3]

Plaintiffs CMFG Life Insurance Company, CUMIS Insurance Society and MEMBERS Life Insurance Company (collectively, "CUNA Mutual"), are all insurance companies organized under Iowa law. Each maintain their headquarters in Madison, Wisconsin. Defendant Credit Suisse is an SEC-registered broker-dealer. Defendant and its sole member, Credit Suisse (USA) Inc., are Delaware companies with their principal place of business in New York.[4]

CUNA Mutual purchased all twelve RMBS certificates at issue in this lawsuit from Credit Suisse. Generally speaking, each consisted of securitized residential mortgage loans packaged into certificates that investors can purchase.[5]

CUNA Mutual purchased the twelve RMBS certificates from Credit Suisse in seven separate RMBS offerings.[6] Only one of these certificates, BSMF 2006-SL1, was *not*

---

[3] The following facts are material and undisputed, unless otherwise noted.

[4] Because the parties are completely diverse and the amount in controversy exceeds $75,000, this court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

[5] The RMBS market is obviously complicated, and since its collapse in 2007, the market has been the subject of scholarly articles and books, as well as myriad exposés and news articles, to say nothing of detailed explanations in various legal decisions. Accordingly, the following is a brief, general overview of the mechanics surrounding the RMBS transactions at issue this lawsuit.

[6] Specifically, the certificates at issue are as follows: BSMF 2006-SL1 (CUSIP 07400WAB6), CSFB 2005-FIX1 (CUSIP 22541S5V6), CSFB 2005- FIX1 (CUSIP 22541S5W4), CSFB 2005-FIX1 (CUSIP 22541S6C7), CSFB 2005-8 (CUSIP 2254583K2), CSFB 2005-8 (CUSIP 2254583L0), HEMT 2005-4 (CUSIP 2254584N5), CSFB 2005-9 (CUSIP 2254586R4), CSFB 2005-9 (CUSIP 2254586X1), CSFB 2005-3 (CUSIP 225458LU0), HEMT 2006-3 (CUSIP 436944AG7) and HEMT 2006-3 (CUSIP 436944AJ1).

issued or underwritten by Credit Suisse.[7]  *All* of the certificates that CUNA Mutual purchased from Credit Suisse were from mezzanine or other subordinated tranches, which were essentially stratified classes of RMBS certificates that are differentiated by priority of principal and interest payments from the underlying loan pools.  Importantly, subordinated tranches absorbed losses from defaulting loans before more senior tranches.

The offering documents for the RMBS certificates at issue included prospectuses, term sheets, free writing prospectuses, preliminary prospectus supplements and final prospectus supplements.  Again generally speaking, prospectus supplements described the characteristics of the tranches in the securitization, including the designated payments to be distributed from the trust or issuing entity that owns the pool of mortgages.  Still, the parties agree for purposes of summary judgment that prospective investors in RMBS certificates like CUNA Mutual were generally unable to perform their own due diligence with respect to the quality of the securitized loans, unlike the issuers and underwriters.

Having said that, the prospectus supplements did include aggregated loan data presented in "collateral stratification tables," which classified loans in particular statistical ranges or by characteristics.  This aggregated data was derived from "loan tapes," also referred to as "Mortgage Loan Schedules" ("MLSs"), that contained detailed loan-level data for those loans securitized into the RMBS. Among characteristics generally used to evaluate credit risk of the collateral loans described in MLSs were FICO score, loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratio, debt-to-income ("DTI") ratio, owner-occupancy status and loan documentation type.  The prospectus

---

[7] Bear Stearns was the issuer and underwriter of BSMF 2006-SL1 (for purposes of this opinion, also referred to as "the Bear Stearns certificate").

supplements also disclosed "Pooling and Servicing Agreements" ("PSAs").  In the PSAs, the sponsors of a securitization made representations and warranties regarding the loans underlying that securitization.  The PSAs supporting each of the twelve RMBS certificates at issue in this case included the specific representation and warranty that the information in the accompanying MLS was "complete, true and correct in all material respects" or was "true and correct in all material respects."  Other than for the BSMF 2006-SL1 certificate that Credit Suisse sold but did not issue or underwrite, these representations and warranties were made by "a Credit Suisse affiliate" as to each certificate at issue.[8]

OPINION

Federal Rule of Civil Procedure 56(c) directs that the court grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  Applying this standard, the court addresses

---

[8] It does not appear that Credit Suisse disputes that DLJMC was a Credit Suisse affiliate, though it is not entirely clear.  (Def.'s Resp. to Pls.' Add'l PFOFs (dkt. #141) ¶ 76.)  Regardless, the court considers this undisputed for purposes of summary judgment.

each of the three separate grounds defendant advances for entry of partial summary judgment below.

I.      The BSMF 2006-SL1 Certificate

With respect to BSMF 2006-SL1 certificate issued and underwritten by Bear Stearns, rather than Credit Suisse, plaintiffs assert a claim for rescission based on mutual mistake. At least for summary judgment purposes, the parties focus on a single element on which plaintiffs must prevail to rescind this transaction: could a rational trier of fact find that it would be more equitable to allocate CUNA Mutual's losses as to BSMF 2006-SL1 to Credit Suisse? (Def.'s Opening Br. (dkt. #95) at 1; Pls.' Resp. Br. (dkt. #133) at 1.)

Defendant Credit Suisse argues that it cannot be found culpable for these losses because it only acted as a "market maker" for that certificate, purchasing it on the secondary market on April 24, 2007, before selling it to plaintiffs that same day "in exchange for a small spread between the buy and sell prices as its payment for providing that service." (Def.'s Opening Br. (dkt. #95) at 3.) In this role, defendant contends, it had no responsibility with respect to acquiring any of the underlying loans, securitizing them or making any representations in the offering documents. Defendant further contends that plaintiffs were aware that it had no other involvement in the Bear Stearns certificate. In particular, defendant points to deposition testimony from Mark Prusha, the sole individual responsible for CUNA Mutual's RMBS purchases during the time period relevant to this lawsuit. As to BSMF 2006-SL1, Prusha admitted having no "expectation . . . that Credit Suisse was performing any due diligence on that certificate

given that it neither issued nor underwrote that deal." (Dep. of Mark Prusha (dkt. #102) at 112:11-16.) Prusha also testified at his deposition that he "understood that Credit Suisse was not making any representation one way or the other about the nature or the quality of the collateral underlying" the certificate, at least not as it would have in the capacity as an "original underwriter or co-manager." (*Id.* at 123:18-124:2.)

Even more to the point for purpose of defendant's pending motion, Prusha acknowledged that his "assumption would be that [Credit Suisse] would have the same information that [he] would have" with respect to the Bear Stearns certificate, although plaintiffs would emphasize that Prusha went on to acknowledge this assumption was based only on his "speculation." (*Id.* at 129:12-22.) As for the information available to Prusha at the time of purchase, he had analyzed BSMF 2006-SL1 on the same morning he purchased it from Credit Suisse, and plaintiffs do not dispute that because Bear Stearns was one of the banks with which Prusha did the most business, he was especially familiar with their due diligence practices. Finally, defendant emphasizes plaintiffs' concession in response to an interrogatory that "[b]ecause Credit Suisse did not originate the underlying loans or sponsor, issue, or underwrite the BSMF 2006-SL1 securitization, based on the evidence adduced to date, CUNA Mutual is unable to identify any Credit Suisse misstatements or omissions related to the BSMF 2006-SL1 Certificate." (Decl. of Hector J. Valdes Ex. 48 (dkt. #97-48) at 2 n.1.)

In light of all of this evidence, plaintiffs primarily responds by pointing out the broader picture, in that Credit Suisse was one of the most significant participants in the RMBS market during the relevant period, having touted the quality of its due diligence

6

practices and its unique perspective on the reliability of the loan originators. Because of its superior knowledge, plaintiffs essentially argue that a rational trier of fact could find Credit Suisse not only overlooked the flaws in its own diligence process, but ignored growing evidence of material flaws in the RMBS market generally and Bear Sterns certificates in particular.

As an initial matter, plaintiff focuses on evidence of culpability, when the basis for rescission is mutual mistake, meaning *neither* party is culpable, and the question for the trier of fact is whether it is *equitable* to leave CUNA Mutual holding a now worthless certificate *or* transfer that loss to defendant Credit Suisse. Plaintiffs' attempt to widen the perspective of the relevant inquiry regarding the Bear Sterns certificate, however, runs into at least two other obstacles. First, plaintiffs attempt to fault defendant for "provid[ing] no support for its implicit assertion that the facts relevant to weighing the equities in cases of mutual mistake are limited to facts specific to the transaction at issue," claiming further that the Restatement (Third) of Restitution and Unjust Enrichment does not "impose[] such a limitation." (Pls.' Resp. Br. (dkt. #133) at 13.) But in reply, defendant rightly quotes the Restatement that when, as here, the defendant cannot be restored to the status quo ante, rescission is available to a plaintiff only when "the fault of the defendant or the assignment of risks *in the underlying transaction* makes it equitable that the defendant bear any uncompensated loss." Restatement (Third) of Restitution and Unjust Enrichment § 54(3)(b) (2011) (emphasis added). As defendant points out, plaintiffs offer no principled stopping point for their assertion that such a

broad universe of facts should be considered relevant for determining whether rescission of a particular transaction is appropriate.

Second, in support of several of the broader facts surrounding Credit Suisse's RMBS-related activities, plaintiffs cite only a settlement agreement between Credit Suisse and the United States Department of Justice ("DOJ"). Defendant argues that the DOJ statement of facts is likely inadmissible under Federal Rule of Evidence 408 as constituting statements made with regard to settlement negotiations. *See Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc.*, Civil Action No. 11-30047-MGM, Civil Action No. 11-30048-MGM, 2017 WL 1709594, at *2 (D. Mass. May 2, 2017) (holding that the settlement agreement between Credit Suisse and the DOJ, as well as the statement of facts, were inadmissible under Rule 408).

Regardless, the undisputed facts suggest that Credit Suisse's employees either knew or should have known that at least five mortgage originators whose loans secured the BSMF 2006-SL1 certificate -- New Century, Resource Bank, Fairmont Funding, Alliance Mortgage and Metrocities Mortgage (Pls.' Add'l PFOFs (dkt. #130) ¶¶ 42-48) -- had a tendency to originate poor quality loans, or at least plaintiffs argue that a trier of fact could reasonably infer. In reply, defendant argues such an inference is too much both because: (a) Credit Suisse had only purchased and sold the certificate the same day, without being asked to examine or warrant the *bona fides* of the certificate, much less the underlying securities loans; and (b) even if it *had* some reason to scrutinize the originators who contributed loans to the Bear Stearns certificate before selling it to plaintiffs, none of those five originators even appeared in the prospectus supplement

because they supplied less than one half of one percent of the loans in the pool. (Def.'s Reply Br. (dkt. #135) at 5-6.)

Admittedly, defendant advances any number of reasons why it should be held no more responsible than plaintiffs, having simply brokered the sale on a single day. At the end of the day, these arguments may well prove dispositive. Indeed, the court is hard-pressed to see shy a broker should be held responsible for a mutual mistake with a buyer.[9] Still, such a finding is best made on a complete trial record, especially in light of plaintiffs having advanced a group of acts from which the court, as the trier of fact, might rationally infer that the defendant deliberately looked the other way at growing evidence of the risks of RMBS certificates, particularly when secured by subordinate traunches, but chose to buy and sell it anyway for the transaction fees. If so, the trier of fact *might* find that it is more equitable for the defendant to be left "holding the bag." As such, the court will deny defendant's motion for summary judgment on this claim.

## II. Aggregated Quantitative Information

Next, defendant moves for partial "summary judgment . . . as to all of CUNA Mutual's claims to the extent they are based on any of the aggregated collateral information presented in the Offering Documents." (Def.'s Opening Br. (dkt. #95) at 15.) Defendant argues that the efforts of plaintiffs' experts -- to identify how many loans out of a random sample from the loan pool had incorrect data with respect to a characteristic related to credit risk and then extrapolate that percentage to the pool as a

---

[9] If anything, this claim for mutual mistake may be more appropriately applied where Credit Suisse is the seller, assuming plaintiffs' other theories of liability are not successful.

whole -- are insufficient to opine reliably on actual, material discrepancies in the stratified collateral tables in the prospectus supplements that presented only aggregate loan data. By way of example, defendant asserts that without any further analysis, plaintiffs cannot show that any value in the tables was false: "if certain of the alleged errors overstated a particular characteristic and others understated the characteristic, the aggregated data could be correct notwithstanding the alleged existence of errors at the individual loan level." (*Id.* at 20.)

In response, plaintiffs stress that their expert found that of 70 sample loans from one certificate, at least three of the thirty-one designated as full documentation loans should have been classified as having a riskier documentation type, and at least three loans out of five that had an incorrect FICO score should have been included in a lower range of scores. Plaintiffs further assert that the trier of fact can draw reasonable inferences from the discrepancies identified by their experts in the sampled pool loans, arguing that defendant's mere speculation that at least some of the adverse errors would be offset by fortuitous ones should not entitle defendant to summary judgment.

At the same time, plaintiffs acknowledge that the defendants in a case cited by Credit Suisse, *National Credit Union Administration Board v. UBS Securities, LLC*, Case No. 12-2591-JWL, Case No. 12-2648-JWL, 2017 WL 235013, at *6 (D. Kan. Jan. 19, 2017), were granted summary judgment "under similar circumstances," involving "allegations that collateral stratification tables were false or misleading." (Pls.' Opp'n Br. (dkt. #133) at 20.) Plaintiffs argue here, however, that the plaintiff in *National Credit Union* presented only a truncated rebuttal in its brief, and the district court relied on an

incorrect assumption that the plaintiff could not demonstrate an error in the stratification tables by identifying individual loan discrepancies, as plaintiff claims to do here with respect to the loan documentation categories and FICO tables.

As one last, practical argument in opposition, plaintiffs submit that granting summary judgment would have little impact on the presentation of the evidence at trial, as plaintiffs view inaccuracies in the collateral stratification tables as only one of "a number of false statements or misleading omissions," and so they "would still present evidence of widespread MLS discrepancies to establish, among other things, that it was false or misleading for Credit Suisse to suggest that the securitization MLSs were 'complete, true, and correct' and that the collateral tables and credit ratings for the securitizations were based on accurate MLSs." (*Id.* at 21.)

In reply, defendant again emphasizes that the burden of establishing falsity belongs to plaintiffs, and it further argues that the few loans that plaintiffs demonstrate should have been categorized differently are not enough to amount to a material misstatement. On this much, the court tends to agree. On balance, however, plaintiffs have offered some, albeit limited, evidence that aggregated values presented in the tables were inaccurate, and the court is unprepared to conclude on this record that defendant is entitled to judgment as a matter of law as to whether there were material misrepresentations in aggregated quantitative information.[10] While the court will, therefore, deny partial summary judgment on this issue, the parties should be prepared to

---

[10] The court may well have been more sympathetic had defendant at least offered *examples* of *actual* under or overstated characteristics that may have offset some of the over valuation detected by plaintiff's experts.

make a proffer and counter-proffer as to the statistical reliability of plaintiff's expert's extrapolations for the larger loan data, both as to sampling confidence levels and relative size of errors to the value of the aggregated data as a whole.

### III. Prejudgment Interest

Finally, defendant moves to preclude plaintiffs from offering two of the three methods that their damages expert used to calculate prejudgment interest. Specifically, Dr. Finnerty, plaintiffs' damages expert, used three different methods to calculate prejudgment interest, per the instruction of counsel. (Def.'s Reply PFOF (dkt. #140) ¶ 104.) Under the first, he calculated "prejudgment interest running on the total consideration paid by CUNA Mutual, not reduced for any principal or interest payments"; the second, he "reduced [that amount] only by principal payments received (and sale proceeds, where applicable)"; and the third, he further "reduced [that amount] by principal payments received and interest payments received (and sale proceeds, where applicable)." (*Id.* at ¶¶ 105-07.) Defendant argues that only the third method, the "interest on the balance" method, would *not* overcompensate plaintiffs by awarding them interest on money that had already been returned to them.

As a general matter, plaintiffs do not dispute that rescission is meant to restore a party to a position that it would have been in had the transaction not occurred. Indeed, besides citing courts that have applied each of the three methods in cases applying state blue sky laws and Section 12 of the Securities Act of 1933, essentially plaintiffs argue that defendant's motion is at worst premature, since the issue of prejudgment interest "may be influenced or mooted entirely by the presentation of evidence at trial." (Pls.' Opp'n Br. (dkt. #133) at 22-23.) Ironically, with respect to this issue, defendant is

placed in the position of having to argue that the same court that granted summary judgment to the defendants on the plaintiff's claim regarding falsities in the stratification tables wrongly denied their motion for summary judgment regarding the proper calculation of prejudgment interest as premature. *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, Case No. 12-2591-JWL, Case No. 12-2648-JWL, 2016 WL 7496106, at *1 (D. Kan. Dec. 30, 2016).[11]

Here, since "[t]he allowance of interest in equity cases is within the discretion of the trial court," *Hauter v. Budlow*, 256 Wis. 561, 572, 42 N.W.2d 261 (Wis. 1950), the court agrees with defendant that plaintiffs have offered no persuasive reason to defer ruling on this issue, let alone award prejudgment interest using a method that does not account for payments already received.  Accordingly, the court will grant summary judgment to defendant on this issue, finding that the appropriate method for calculating prejudgment interest, if awarded at all, is Dr. Finnerty's third method -- calculating interest on the balance method.

ORDER

IT IS ORDERED THAT defendant Credit Suisse Securities (USA) LLC's motion for partial summary judgment (dkt. #94) is GRANTED IN PART AND DENIED IN PART, consistent with this opinion.

Entered this 12th day of October, 2017.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

---

[11] Although less relevant, defendant also cites several cases in which courts decided issues regarding the calculation of prejudgment interest under state blue sky laws and Section 12 of the Securities Act at summary judgment.