CMFG LIFE INSURANCE COMPANY,
CUMIS INSURANCE SOCIETY, and
MEMBERS LIFE INSURANCE COMPANY,

|  |  |
|---|---|
| Plaintiffs, | OPINION AND ORDER |
| v. | 14-cv-249-wmc |
| CREDIT SUISSE SECURITIES (USA) LLC, |  |
| Defendant. |  |

This case is set for a bench trial commencing, October 30, 2017, on plaintiffs CMFG Life Insurance Company, CUMIS Insurance Society and MEMBERS Life Insurance Company's (collectively "CUNA Mutual") claim to rescind purchases of twelve separate RMBS certificates from defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") based on alleged misrepresentations in the offering documents. In advance of the final pretrial conference scheduled for October 24, the court issues the following opinion and order on the parties' motions in limine.

## OPINION

### I. Plaintiffs' Motions in Limine

#### A. MIL No. 1: Admit Credit Suisse's RMBS Settlement Agreement with the Department of Justice (dkt. #173)

In this motion in limine, plaintiffs seek an order admitting a January 2017 settlement agreement between Credit Suisse and the Department of Justice, including a 19-page statement of facts, which plaintiffs represent includes an acknowledgement on the

part of Credit Suisse of "broad misconduct in its creation and sale of [RMBS], including the RMBS that it sold to CUNA Mutual." (Pls. Br. (dkt. #174) 5.) Plaintiffs contend this acknowledgement is admissible as a statement by a party opponent pursuant to Federal Rule of Evidence 801(d)(2)(A). Unsurprisingly, defendant also filed its own motion in limine to exclude the acknowledgement. (Dkt. #186.)

By way of background, on January 18, 2017, Credit Suisse agreed to pay $5.28 *billion* in exchange for the release of the DOJ's civil claims relating to Credit Suisse's RMBS activities. (Strikis Decl., Ex. 1 (dkt. #175-1).) While the settlement concerned several of the same RMBS certificates that CUNA Mutual purchased from Credit Suisse (*see id.*, Ex. 2 (dkt. #175-2) (Annex 3 listing RMBS certificates subject to settlement)), it did not settle individual claims like that asserted by CUNA Mutual here (*see id.*, Ex. 1 (dkt. #175-1) ¶ 6.b)).

As part of the settlement agreement, Credit Suisse "acknowledge[d]" the Statement of Facts. (*Id.*, Ex. 1 (dkt. #175-1) p.2 (citing Ex. 3 (dkt. #175-3) (Annex 1, Statement of Facts))).) In this way, Credit Suisse neither expressly "admit[ted]" liability nor the truth of the statements of facts, nor did it expressly dispute liability or the statement of facts. Still, the statement contains several purported "facts," including that: (1) the offering documents were false; (2) Credit Suisse's due diligence was inadequate; and (3) Credit Suisse knew of misrepresentations in the offering documents, but failed to report that to investors or rating agencies. (*See* Pls.' Br (dkt. #174) 6-7 (describing key factual statements); Strikis Decl., Ex. 3 (dkt. #175-3)).)

Defendant argues that the Settlement and the Statement of Facts should be

excluded under Federal Rule of Evidence 408, which provides in pertinent part:

> Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise *the claim*; and
>
> (2) conduct or a statement made during compromise negotiations about *the claim*--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408 (emphasis added).

Contrary to defendant's argument, however, the Seventh Circuit has interpreted "the claim" language narrowly in applying Rule 408. In particular, the court explained in *Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682 (7th Cir. 2005), that the balance between the "need for the settlement evidence" and the "potentially chilling effect on future settlement negotiations" is "especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered." *Id.* at 689. More recently, the Seventh Circuit reiterated that holding after analyzing the text of Rule 408, concluding that "[t]he Rules' use of the singular term 'claim' suggests that settlements discussions concerning a specific claim are excluded from evidence to prove liability on *that* claim, not on others." *Wine & Canvas Dev., LLC v. Muylie*, 868 F.3d 534, 541 (7th Cir. 2017).

While plaintiffs' claim here certainly is similar to the claims underlying the Credit Suisse-DOJ settlement, this alone does not satisfy the narrow construction of Rule 408.

*Zurich Am. Ins.*, 417 F.3d at 689-90 ("Of course, the two actions are not totally unrelated. Zurich did, after all, raise the deductible agreements as a defense to its duty to defend Watts in *Armenia* and *Rothschild*. Still, the California action--based on the primary liability insurance policies--is distinct from the Illinois petition to compel arbitration under the deductible agreements."). In contrast, defendant directs the court to a District of Massachusetts opinion excluding as evidence the very same settlement agreement as that at issue here under Rule 408. *See Mass. Mut. Life Ins. Co. v. DLJ Mortg. Cap.*, Nos. 11-30047-MGM, 11-30048-MGM, 2017 WL 1709594, at *1-2 (D. Mass. May 2, 2017). In excluding the agreement, the Massachusetts court, however, followed First Circuit precedent as it is required to do. Under its own precedent, that court found the Rule 408 prohibition "applies equally to settlement agreements between a defendant and third party and between a plaintiff and a third party." *Id.* at *1 (quoting *Portugues-Santana v. Rekomdiv Int'l*, 657 F.3d 56, 63 (1st Cir. 2011)). Because the Seventh Circuit adopted a narrow interpretation of Rule 407, however, the *Mass Mutual Life Insurance* decision holds no weight.[1]

From this, the court concludes that Rule 408 does *not* outright bar consideration of the Settlement Agreement, including the Statement of Facts, but this does not end the inquiry. Rather, the question remains on what basis would the court *admit* this document? Plaintiffs contend that the Settlement Agreement and Statement of Facts are admissible

---

[1] Defendant also argues that the CUNA Mutual has no need for the Settlement Agreement because "all of the underlying emails and referenced documents have been produced to CUNA Mutual." (Defs.' Opp'n (dkt. #227) 10.) This argument cuts both ways: if the underlying documents are admissible, what prejudice would Credit Suisse suffer from admitting the Settlement Agreement and the Statement of Facts? On the other hand, if the court credits defendant's argument, then what independent purpose does the Settlement Agreement serve?

generally as the statement of a party opponent under Federal Rule of Evidence 801(d)(2), which provides in pertinent part:

> (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
> (A) was made by the party in an individual or representative capacity; [or]
> (B) is one the party manifested that it adopted or believed to be true;
> . . .

Fed. R. Evid. 801(d)(2). Relying on dictionary definitions of the word "acknowledge," or other cases interpreting that word in other contexts, plaintiffs argue that by acknowledging the Statement of Facts, defendant "admit[ed] or recognize[d] those facts as true." (Pls.' Br. (dkt. #174) 8.)

As defendant points out in its response brief, however, the cases cited by plaintiff in support of this definition of "acknowledge" involve settlement agreements in which the party opponent expressly admitted liability. (*See* Def.'s Opp'n (dkt. #227) 15-16.) Here, Credit Suisse's *acknowledgement* of the Statement of Facts stops short of an admission -- as mentioned above, the Settlement Agreement is silent as to whether Credit Suisse admitted liability. Indeed, the word choice is obviously one of art at best and legalese at worst, which could be construed as an admission or simply notice of the statements that are contained in this compromise document. Absent more, this court has no way of telling for certain which it is.

As such, the Statement of Facts constitutes a "statement" "made by the party in an individual or representative capacity" under Rule 801(d)(2)(A), while the court is hard-pressed to find that the statement was one Credit Suisse "manifested that it adopted or

believed to be true." Fed. R. Evid. 801(d)(2)(B). On the other hand, Credit Suisse did not insist that the Settlement Agreement contain the word *disavowal* of any liability, and the best evidence as to why it paid a fortune to resolve its dispute with the Justice Department would seem to be the so-called Statement of Facts.

As such, the motion is GRANTED in so far as Rule 408 does not bar Credit Suisse's statements in the Settlement Agreement and the Statement of Facts is admitted under Rule 801(d)(2)(A), although the court expresses no opinion without more context as to what weight, if any, the court should attach to it in light of Credit Suisse's having "acknowledge[d]" those facts.

### B. MIL No. 2: Exclude Expert Testimony of William N. Goetzmann, Ph.D. (dkt. #176)

In this motion in limine, plaintiffs seek an order excluding expert testimony. The admissibility of expert testimony in federal courts is principally governed by Federal Rule of Evidence 702, as elucidated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, a district court is to function as a "gatekeeper," determining whether a party's proffered expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable"). Although "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), expert testimony must, therefore, satisfy the following three-part test:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and
>
> (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Given that this case will be tried to the bench, where the court need not worry about protecting a jury, "the court's gatekeeping role is necessarily different." *In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006). In particular, "the need to make [reliability] decisions prior to hearing the testimony is lessened." *Id.* In deciding this motion and the other motions challenging expert testimony, therefore, the court's *focus* will be on the relevance or usefulness of the expert opinion, rather than its reliability. Although for the reasons explained below, the court will strike some proposed testimony that is so unreliable the

court need not wait to rule.[2]

As for William Goetzmann's statistical analysis that is the subject of plaintiff's MIL No. 2, he opines that the loans underlying the Certificates at issue in this case performed as expected based on the loan characteristics disclosed in the Offering Documents and prevailing macroeconomic conditions during the relevant period. More specifically, relying on his statistical analysis and other economic studies, Goetzmann concludes that macroeconomic conditions caused a historic rise and fall in U.S. housing prices that ultimately led to the decline in value of the RMBS at issue in this case. Defendant argues that Goetzmann's testimony, therefore, refutes plaintiffs' position that: (1) there were misrepresentations in the offering documents; and (2) these misrepresentations caused the underperformance of the Certificates.

### 1. Regression Analysis

Plaintiffs challenge two regression analyses. The *first* regression analysis uses a linear regression model to compare the performance, measured by default rates, of the loans in the supporting loan groups ("SLGs") underlying the Certificates at issue in this case to a "comparison sample" consisting of millions of Alt-A, subprime and second-lien mortgage loans taken from approximately 1,546 non-agency RMBS offerings that were issued between 2004 and 2006, excluding all RMBS that were underwritten, issued or sponsored by Credit Suisse. (Pls.' Br. (dkt. #177) 10.) Perhaps anticipating plaintiffs' motion,

---

[2] To the extent excluded, the court is treating the expert's report as the proponent's proffer for purposes of the record, consistent with its intent to rely on those reports in lieu of the experts' direct testimony on this case, but will not preclude the losing party from making a further proffer at the Final Pretrial Conference.

Goetzmann then created a "modified comparison sample," which removed any loans subject to litigation. (*Id.* at 11.) In its response brief, defendant solely relies on the modified sample to oppose the motion in limine, apparently conceding, at least in part, the validity of plaintiffs' criticism of Goetzmann's analysis based on his original comparison. As such, the court limits its review of the parties' arguments to the modified sample.

In his report, Goetzmann purports to "calculate a predicted rate for each of the [SLGs]," after selecting a comparison sample, relying on the stated loan and borrower characteristics of each SLG at-issue and the "changes in macroeconomic conditions" to which each was exposed and assuming that the SLGs had been truthfully described by Credit Suisse in the offering documents and otherwise. (Goetzmann Rept. (dkt. #207) ¶ 73.) Goetzmann then compared this *predicted* default rate calculated based on the modified comparison sample against the *actual* default rate of the SLGs at issue. Based on the modified comparison sample, Goetzmann concluded that for five of the seven Certificates, "the actual default rates did *not* exceed the predicted default rate at a statistically significant level." (Pls.' Br. (dkt. #177) 12 (quoting Goetzmann Rept. (dkt. #207) ¶ 77).) From this, Goetzmann opined that "the default and delinquencies experienced by the [SLGs] are (1) consistent with their stated characteristics and the changes in macroeconomic conditions and (2) are consistent with the hypotheses that alleged defects did not exist or did not affect the performance of the [SLGs]." (*Id.* (quoting Goetzmann Rept. (dkt. #207) ¶ 78).)

In challenging this analysis, plaintiffs direct the court to the decisions of two other district courts, one of which excluded Goetzmann's testimony based on the same regression analysis, *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, Nos. 12-2591-JWL, 12-2648-

JWL, 2016 WL 7373857, *6-8 (D. Kans. Dec. 20, 2016) ("*NCUA*"), and the other of which excluded the same benchmark regression analysis of another expert in a similar RMBS lawsuit, *Fed. Hous. Fin. Agency v. Nomura Holding Am.*, No. 11cv6201 (DLC), 2015 WL 539489, *6-7 (S.D.N.Y. Feb. 10, 2015) ("*Nomura*").  As those courts found, plaintiffs argue, that the comparison samples underlying Goetzmann's analysis were not proper controls, making the analysis itself unreliable.

Stated another way, Goetzmann would opine that the underwriting defects did not "cause" the underperformance of the Certificates by purportedly comparing the performance to a group of underlying loans that did *not* suffer from the same underwriting errors.  Assuming for purposes of argument that such a comparison has a bearing on causation here, however, Goetzmann apparently made *no* effort to ensure that the original comparison sample contained loans that did not have underwriting errors.  *See NCUA*, 2016 WL 7373857, at *6 ("If the other loans suffered from similar defects found in the subject loans, then a comparison using those other loans could not determine whether factors other than the defects caused the loans."); *Nomura*, 2015 WL 539489, at *5 ("[W]hen designing an experiment to test whether an observed result was caused by [a] given variable, the control or benchmark group must lack that variable.  That is the whole point of a control group.")

While the modified sample removed all loans subject to litigation, defendants concede that even this modified sample is not "clean."  (Def.'s Opp'n (dkt. #228) 21 (citing Goetzmann Dep. (dkt. #170) 53 (stating that creating a clean empirical sample "is not something that is easily done" and not necessary to his analysis").)  *See also NCUA*,

2016 WL 7373857, at *7 ("Dr. Goetzmann conceded in his testimony that the absence of litigation was not a clear proxy for a lack of defects, and he refused to express an opinion as to whether the absence of litigation is an accurate predictor of compliance."). The court agrees with the other district courts that while removing loans that are subject to litigation may be a "good start for creating a clean benchmark," *Nomura*, 2015 WL 539489, at *7, Goetzmann's modified sample falls short of providing a reliable control group. *See also NCUA*, 2017 WL 7373857, at *7 (rejecting analysis based on modified benchmark excluding loans subject to litigation).

In opposition, defendant repeats Dr. Goetzmann's position that a clean sample "does not bear on the reliability or scientific validity of [his] methodology" (Def.'s Opp'n (dkt. #228) 22), but in support merely offers a convoluted argument involving Goetzmann's second regression analysis as described below. Regardless, for the reasons explained above and in the opinions of other district courts striking the same or similar expert testimony, the court agrees that absent a clean control group, Goetzmann's first regression analysis is not a reliable basis to opine that the alleged underwriting defects were not the cause the certificates' underperformance. As such, the court will grant plaintiffs' motion to exclude from trial the first analysis and Goetzmann's opinions based on that analysis.

As for Goetzmann's *second* regression analysis, he purports to have compared the actual performance of loans in the SLGs categorized by plaintiffs' expert Stephen Butler as "materially defective" with the actual performance of loans in the SLGs that Butler did not

categorize as "materially defective."[3]  Goetzmann then ran a "logit regression" on the 686 sampled loans, using whether a loan had ever been "in default" as its dependent variable and several independent variables, including owner occupancy, LTV, housing prices, along with the "binary variable" indicating whether Butler categorized the loan as materially defective.  From this, Goetzmann found loans deemed "materially defective" *were* more likely to default, but also found this variable was not statistically significant.  From this, Goetzmann again opined that "the alleged underwriting defects identified by Mr. Butler in the loans he reviewed did not contribute to the defaults and delinquencies experienced by the loans from the [SLGs]."  (Pls.' Br. (dkt. #177) 13 (quoting Goetzmann Rept. (dkt. #270) ¶ 85).)

In challenging this opinion and underlying testimony, plaintiffs take issue with Goetzmann's reliance on Butler's own categorization, claiming that he was "intentionally conservative and under-inclusive" in categorizing loans as "materially defective."  (Pls.' Br. (dkt. #177) 9.)  From this, plaintiffs argue that "Dr. Goetzmann improperly equates the *absence* of a finding that a loan is "Materially Defective" with the *presence* of an affirmative finding that the loan is free of defects."  (*Id.* at 21.)  At most, this criticism goes to weight, not admissibility.  Even if Butler's categorization falls short of creating a completely clean sample, Goetzmann's reliance on plaintiff's expert Butler's own system of categorizing loans as "materially defective" against those not categorized as "materially defective," seems reasonable in a "but for" world.  While plaintiffs may argue that Butler's analysis

---

[3] Butler purported to categorize loans based on underwriting defects at the time the loans were originated.

12

was so under inclusive as to undermine Goeztmann's analysis, the court sees no reason to strike his testimony as unreliable on that basis. On the contrary, using plaintiffs' expert to draw a line between loans that suffer from material underwriting defects and those that do not, at least brings the parties' competing analysis closer to talking about an "apples to apples" comparison.[4]

### 2. Macroeconomic Conditions

Finally, plaintiffs seek to exclude Goeztmann's testimony more generally as to larger macroeconomic forces being the cause of the underperformance of the Certificates at issue. Plaintiffs contend that this testimony is only relevant to defendant's loss causation defense, which is subject to its own motion in limine, and to prove it, defendant would need to prove that "the loss in the value of the security was proximately caused by events unrelated to the phenomena underlying the alleged misrepresentations." (Pls.' Br. (dkt. #177) 23 (quoting *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 589 (S.D.N.Y. 2015), *aff'd sub nom.* No. 15-1872-CV, 2017 WL 4293322 (2d Cir. Sept. 28, 2017).)

As an initial matter, plaintiffs cite to Judge Cote's post-trial opinion in *Nomura*, which found that the defendant failed to prove the affirmative defense of loss causation. The Second Circuit has since articulated a different, arguably lower standard of proof,

---

[4] In fairness, Judge Cote in the *Nomura* case agreed with plaintiffs and struck similar analysis of another expert. *See Nomura*, 2015 WL 539489, at *8-9. This court may ultimately agree with Judge Cote's reasoning, but will consider defendant's challenge after hearing both sides' testimony, particularly since unlike the expert in *Nomura*, plaintiffs' expert will be available for cross-examination, thus distinguishing this case from the circumstances in *Nomura*. *Id.* at *9.

however, which requires only a showing that "the risk that caused the loss[es] was [not] within the risk concealed by the misrepresentations and omissions." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 15-1872-CV, 2017 WL 4293322, *51 & n.73 (2d Cir. Sept. 28, 2017). Regardless of the precise standard of proof, however, whether the macroeconomic conditions Goetzmann describes operated independently from defendant's alleged misconduct is an area for cross-examination and not a basis for excluding this portion of Goetzmann's testimony.

Accordingly, plaintiffs' motion is GRANTED IN PART AND DENIED IN PART consistent with this opinion.

### C. MIL No. 3: Exclude Evidence of Post-Transaction Loss Causation (dkt. #179)

Related to plaintiffs' challenges to Goetzmann's testimony, plaintiffs move to exclude defendant's evidence of post-transaction loss causation generally. (Pl.'s Mot. (dkt. #179.)) Plaintiffs argue that loss causation is neither an element nor an affirmative defense to a rescission claim under Wisconsin law, and therefore causation evidence should be barred. Since this evidence is relevant to the court's consideration of the equities here, as well as for other purposes relevant to plaintiff's rescission claim, the motion is DENIED.

In formalist terms, plaintiffs' argument has some merit. A material misrepresentation results in the failure of mutual assent, and therefore, the failure to form a contract. Restatement (Second) of Contracts § 163. Thus, a party may unilaterally void a contract if (1) its assent was induced by a material misrepresentation; and (2) it was justified in relying upon that misrepresentation. *Id*. at § 164(1). The party seeking

rescission does not need to show causation to make a prima facie case.

Here, plaintiffs seek rescission based upon material misrepresentations made at the time of sale. Allegedly, the RMBS certificates were substantially less valuable than defendant represented, making the contract flawed from the very beginning. Plaintiffs argue that since the contract was voidable at the time of sale, any consideration of the housing market or other forces later affecting the value of the certificates would be inappropriate -- a true contract never existed.

However, rescission is an equitable remedy. When exercising this discretionary power, the court must balance the equities of the parties. As noted by the Seventh Circuit, Wisconsin courts have previously drawn from the Restatement of Restitution and are likely to adopt its rules for granting rescission. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 736 (7th Cir. 2015) ("In deciding cases involving rescission, the Wisconsin Supreme Court has drawn from restatements, including the Restatement of Restitution") (citations omitted).[5] Restatement (Third) of Restitution and Unjust Enrichment § 54(3) (2011) states:

> Rescission is limited to cases in which counter-restitution by the claimant will restore the defendant to the status quo ante, unless
>
> > (a) the defendant is fairly compensated for any deficiencies in the restoration made by the claimant, or
> >
> > (b) the fault of the defendant or the assignment of risks in

---

[5] Plaintiffs argue that under *Admiral Ins. Co. v. Paper Converting Mach. Co.*, 811 NW.2d 351 (Wis. 2012), the Restatement of Restitution only applies when a party asserts an unjust enrichment claim. In *Admiral*, however, the court was addressing the issue of whether or not an insurer could make an unjust enrichment claim, and it was directly addressing the substance of that claim. *Id.* at 361. Since the claim was barred, citations to the Restatement were considered unpersuasive, but *Admiral* did not limit the Restatement of Restitution to claims for unjust enrichment.

> the underlying transaction makes it equitable that the
> defendant bear any uncompensated loss.

In this case, subsection (b) *may* apply.  If so, defendant may end up bearing some or all of

the loss caused by the RMBS certificates' underperformance based on fault.  Loss causation

may, therefore, be a factor in the equitable allocation of fault or risk.

In arguing that causation evidence is nevertheless barred, plaintiffs rely heavily on

*First National Bank & Trust Company of Racine v. Notte*, 97 Wis. 2d 207, 293 N.W.2d 530

(Wis. 1980), a case that -- as plaintiffs admit -- is about scienter.  Under *Notte*, innocent

misrepresentation is not a defense to rescission claims.  For example, defendant could not

argue that rescission is legally barred because, unbeknownst to defendant, mortgagors lied

on their mortgage applications.  Again, however, the *Notte* decision cannot be read so

broadly as to bar all evidence of causation, nor is *Notte* in conflict with the Restatement of

Restitution.

While disagreeing on the relevance of loss causation itself, both parties recognize

that some form of harm may be important to establish a claim for rescission.  So, too, does

this court as explained in a 2014 opinion, issued in a substantially similar case, also

involving plaintiffs.

> [Defendant] relies on the Wisconsin Court of Appeals'
> decision in *Tam v. Luk*, 453 N.W.2d 158 (Wis. Ct. App. 1990),
> which held that "a showing of pecuniary loss is not necessary
> to establish a claim for rescission based on a seller's
> misrepresentation of the status of the subject property, . . .
> [but] there must be some showing of prejudice, damage or
> detriment to the buyer." *Id*. at 288. While this proposition
> makes some intuitive sense, CUNA Mutual is correct that
> Wisconsin's law on rescission arises from the Restatement
> (Second) of Contracts, *see Notte*, 97 Wis. 2d at 222 (adopting
> Restatement approach), and the Restatement expressly

provides that "the recipient of a misrepresentation need not show that he has actually been harmed by relying on it in order to avoid the contract." Restatement (Second) of Contracts § 164 cmt. c. In light of the Restatement, it seems more accurate to say that a showing of harm, while not mandatory, is nevertheless an important and sometimes dispositive factor in a court's determination of whether it should exercise its discretion to order rescission given the facts and circumstances of a particular case. *See Ott v. Peppertree Resort Villas, Inc.*, 716 N.W.2d 127, ¶ 55 (Lundsten, P.J., dissenting).

*CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-CV-037-WMC, 2014 WL 3696233, at *22 (W.D. Wis. July 23, 2014), *aff'd in part, rev'd in part*, 799 F.3d 729 (7th Cir. 2015). The reasoning from *RBS* remains applicable, as both plaintiffs' reliance and defendant's related causation of harm may well be important factors in the court's decision to exercise its discretion in awarding total or partial rescission.

Finally, defendant argues that the facts underlying loss causation are relevant to plaintiffs' affirmative claims. Most significantly, defendant intends to rely affirmatively on much of their expert Goetzmann's opinion *not* excluded by the court to show that the performance of the RMBS certificates matched their stated characteristics. (Goetzmann Rept. (dkt. #142) ¶¶ 68-86.) As far as this is offered to rebut plaintiffs' claims of material misrepresentation, it is admissible. Of course, the parties will still have an opportunity at trial to argue which evidence should, and should not, inform the court's exercise of its discretion under rescissionary principles.

## II. Defendant's Motions in Limine

### A. MIL No. 1: Exclude Settlement Agreement Between the Department of Justice and Credit Suisse and Similar Settlements (dkt. #186)

This motion is DENIED for the same reasons provided in granting plaintiffs' motion

in limine no. 1.

**B. MIL No. 2: Exclude Evidence Concerning the 2012 Settlement Between Credit Suisse and the SEC (dkt. #186)**

This motion touches on markedly similar concerns as raised in the admissibility of the 2017 Settlement Agreement between Credit Suisse and the DOJ in plaintiffs' motion in limine no. 1 and defendant's motion in limine no. 1. Here, defendants seek to exclude a 2012 settlement between Credit Suisse and the SEC regarding loan repurchases by Credit Suisse and the use of those proceeds. Defendant offers two, core reasons why this evidence should be excluded under Federal Rules of Evidence 401, 402, 403 and 408. First, in its 2012 agreement with the SEC, Credit Suisse consented to entry of the cease-and-desist order "[s]olely for the purposes of these proceedings . . . and without admitting or denying the findings herein." (Def.'s Br. (dkt. #187) 15 (quoting Valdes Decl., Ex. 15 (dkt. #190-9).) Second, the allegations underlying that settlement agreement concerned repurchase of certain obligations under the Pooling and Servicing Agreements and had no bearing on the alleged misstatements at issue in this lawsuit.

For the same reasons described above in rejecting Rule 408's application to the Credit Suisse-DOJ settlement, the court agrees with plaintiff that the 2012 SEC settlement is not barred by Rule 408. This leaves defendant's challenges to the possible relevance of the 2012 settlement, and whether it is outweighed by undue prejudice to Credit Suisse. Plaintiffs contend that the settlement is relevant to the efficacy of Credit Suisse's due diligence for two reasons: (1) "the SEC Order shows that Credit Suisse willfully disregarded red flags that should have alerted Credit Suisse to the fact that many of the

loans it had securitized violated underwriting guidelines"; and (2) "the SEC's findings demonstrate Credit Suisse's perverse financial incentives to avoid conducting thorough due diligence and quality control." (Pls.' Opp'n (dkt. #222) 13-14.)

As set forth in the 2012 SEC Agreement, when Credit Suisse purchased loans from originators, it generally received representations and warranties that allowed Credit Suisse to demand that the originator repurchase the loan if the borrower missed one of the first three mortgage payments after Credit Suisse's purchase -- a so-called "early payment default." When this occurred after Credit Suisse had already securitized the loan, however, rather than requiring the originator to repurchase the loan, Credit Suisse instead demanded a cash payment from the originator, without passing along those proceeds or otherwise informing the RMBS investor about the early payment default under that loan or repurchasing that loan from the securitized trust. The SEC found that from 2005 to 2012 Credit Suisse had "improperly obtained" more than $55 million in such payments.

To put those payments in context, plaintiffs intend to offer the 2012 SEC settlement as evidence that Credit Suisse knew of defective loans as early as 2005, but opted to ignore the problems with the underlying loans and not improve its due diligence efforts because it was financially lucrative not to do so. While the evidence underlying the 2012 SEC settlement, as well as the statement that defendant neither admits nor denies the SEC's findings, may be admissible, the same issue as to the weight the court should assign to the 2012 settlement is the same as the 2017 settlement with the DOJ. Nevertheless, the court will DENY defendant's motion in limine.

### C. MIL No. 3: Exclude Evidence Concerning the Financial Crisis Inquiry Commission Report (dkt. #186)

In the next motion, defendants seek to exclude a 2010 Report by the Financial Crisis Inquiry Commission ("FCIC Report") on relevance grounds under Federal Rules of Evidence 401 and 402 and as inadmissible hearsay under Rule 802.[6]  Defendant argues that a report "on the causes of the financial crisis are not relevant to the disputed issued in this case," and even if the report touched on relevant issues, that it should be excluded because it is "not the product of a reliable adjudicatory process."  (Def.'s Br. (dkt. #187) 17.)

In their response, plaintiffs offer various ways that the report is relevant:  (1) demonstrating falsity and materiality of the underwriting defects to "a reasonable investor" who "would not have known (but would have considered important) the kind of information about mortgage quality that Credit Suisse withheld from investors"; (2) rebutting any argument that conforming with industry practices should be deemed adequate in light of widespread due diligence problems; and (3) responding to Credit Suisse's loss causation defense with the report's finding that "Credit Suisse's conduct in securitizing defective mortgage was part and parcel of the macroeconomic factors that Credit Suisse seeks to blame for [] CUNA Mutual's losses."  (Pl.'s Opp'n (dkt. #222) 18.) The court finds each of these bases adequate to find that the report is relevant to the claims

---

[6] Defendant also sought to exclude a 2011 Report by the U.S. Senate Permanent Subcommittee on Investigations into the origins of the 2008 financial crisis.  (Def.'s Br. (dkt. #187) 16.)  In their response brief, however plaintiffs disavowed any intent to introduce this report at trial.  (Pls.' Resp. (dkt. #222) 17 n.5.)  As such, this portion of defendant's motion will be GRANTED AS UNOPPOSED.

at issue in this lawsuit.

As for defendant's challenge to the reliability of the report, the court agrees with plaintiffs that this challenge simply goes to the weight the court may place on the report and not to its admissibility. Furthermore, because this case will be tried to the bench, concerns about prejudice under Rule 403 are largely abated. *See United States v. Lim*, 57 F. App'x 701, 704 (7th Cir. 2003) ("[W]e reject Lim's Rule 403 claims, which are inapposite in a bench trial, where there is no risk of jury prejudice."); *United States v. Shukri*, 207 F.3d 412, 419 (7th Cir. 2000) ("In a bench trial, we assume that the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary.").

This leaves defendant's argument that the report is inadmissible hearsay. Anticipating plaintiffs' response, defendant specifically asserts that the report does not fall under the exception to hearsay for "factual findings from a legally authorized investigation," because the "source of information or other circumstances indicate lack of trustworthiness." (Def.'s Br. (dkt. #187) 18 (quoting Fed. R. Evid. 803(8)).) As support, defendant directs the court to a statement by the Vice Chairman of the FCIC "that the Commission was created for political purposes with a partisan structure and a partisan agenda." (*Id.* (quoting Statement of Bill Thomas, Testimony Before the House Committee on Financial Services, Feb. 16, 2011, available at https://financialservices.house.gov/media/pdf/021611thomas.pdf).)

As plaintiffs point out in reply, however, this is the *only* evidence defendant offers to support a finding that the report is untrustworthy. Indeed, Vice Chairman Thomas

included a 27-page dissenting statement in the report itself, explaining his disagreement with certain findings, thus ameliorating any concern that only one political view was represented in the report. Moreover, the dissent of one individual member of the committee, simply raising questions about whether the investigation was colored by politics, does not by itself render the report unreliable. *See Daniel v. Cook Cty.*, 833 F.3d 728, 740 (7th Cir. 2016) ("We assume that public officials, in crafting such a report, acted properly and without bias."). For these reasons, other courts have found the FCIC report sufficiently trustworthy to be admissible under the Rule 803(b) exception. (Pl.'s Opp'n (dkt. #222) 19-20 (citing cases).)

Finally, defendant challenges as hearsay-within-hearsay those third-party statements contained within the reports, citing cases from the Seventh Circuit affirming exclusion as hearsay statements made by third parsons contained in official public reports. (Def.'s Br. (dkt. #187) 19.) For their part, plaintiffs concede that statements of individuals quoted in the report are inadmissible hearsay, but contend that they seek to submit the report for the truth of its findings, not for the truth of the matters asserted in individual statements. As such, the court will DENY the motion in limine, subject to rejecting any third party statements for the truth of the matter asserted.

### D. MIL No. 4: Exclude Testimony of Two Witnesses Whose Prior Testimony Was Found by a Court in Another RMBS Case to be Tainted and Improperly Procured (dkt. #186)

Defendant also seeks to exclude the deposition testimony of Ron Szukala and Diane Johnson under Rule 403. Szukala and Johnson were employees of third-party vendors with whom Credit Suisse's due diligence department contracted in connection with loan

reviews. CUNA Mutual requested that defendant produce transcripts and exhibits of two depositions in another RMBS action. While producing both, defendant did so without waiving its right to seek their exclusion at trial.

In support of its motion to exclude these witnesses' testimony, defendant directs the court to an opinion by a New York Supreme Court judge in another RMBS action expressing "serious concerns . . . about the veracity of their testimony and the manner in which it was procured." (Def.'s Br. (dkt. #187) 21) (citing *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, No. 603751/2009 (N.Y. Sup. Ct. Oct. 3, 2013)).) (*See* Valdes Decl., Ex. 17 (dkt. #190-10).) In that case, the defendants, which included Credit Suisse, sought to compel the production of plaintiff's counsel's communications with certain third-party witnesses, employees of third-party vendors of Credit Suisse's due diligence department. Plaintiff relied on affidavits of those third-party witnesses in alleging fraud. During the witnesses' depositions, defendants discovered that plaintiff had "paid substantial sums of money (in certain cases more than $10,000) to witnesses and flew the witnesses from across the country to New York so that they could recount their knowledge of (and possible participation in) defendants' fraudulent business practices." (*Id.* at 4.) Plaintiff's counsel had also "worked with these witnesses to draft affidavits," "extensively prepped them prior to deposition and defended their testimony against cross-examination by defendants." (*Id.*) Moreover, during the depositions "several of the witnesses began to recant their testimony or indicated that what was written in their affidavits was the work of [plaintiff's] counsel and was not entirely an accurate description of their knowledge." (*Id.* at 5.) While the court granted the defendants' motion to compel, finding a "reasonable suspicion of a

witness dissembling" (*id.* at 7), the court did *not* strike or exclude their deposition testimony, including the testimony of the two witnesses challenged here.

As an initial matter, Rule 403 has less traction in the context of a bench trial.  *See Lim*, 57 F. App'x at 704.  Here, the two witnesses at issue were specifically asked about the role of the plaintiff's counsel in drafting their affidavits and preparing them for trial. Accordingly, the court will consider that testimony in assessing what weight, if any, their testimony deserves as a whole.  However, the court sees no basis to strike the testimony out of hand, even though defendant has painted a compelling picture as to how the testimony has been tainted.  Because this determination is best made after reviewing the parties' deposition designations, this motion is DENIED.

### E.  MIL No. 5: Partially Exclude the Expert Testimony of Leonard A. Blum (dkt. #182)

In this motion, defendant seeks to exclude certain testimony of plaintiff's expert Leonard A. Blum.  In his report, Blum purported to opine as to the materiality of information contained in the initial offering documents for the Certificates at issue.  At his deposition, however, Blum indicated that the opinion in his report is limited to the Certificates purchased in the initial offering or primary market, while the majority of the Certificates at issue were purchased on the secondary market.

In reviewing one of the Certificates at his deposition in the case in particular, Blum discovered, apparently for the first time, that it was issued on the secondary market:

> By the way, I just want to mention when I answered your questions about would someone buy something in the anticipation of it being downgraded, I thought we were talking

> about primary offerings of securities. This looks like a
> secondary trade.
>
> . . . So there it's a different situation because . . . you've got an
> established history for the bond which is information that's . .
> . different. When you're buying in the primary market, that
> doesn't exist.

(Blum Dep. (dkt. #195) 340.) Based on this exchange, counsel for defendant then asked: "Are you saying that the materiality of purchases bought on the secondary market are not within the scope of your report?," to which Blum responded, "When you're talking about the secondary market purchases, the information is different. It's a different dynamic than a primary security purchase." (*Id.* at 341; *see also id.* at 344 (again reiterating that "I'm not opining about anything in the secondary market."; "Secondary market is a totally different market;" and "Prospectuses don't have the importance as they do of -- of a primary offering of securities.").)

In the face of this unambiguous disavowal of any application of his materiality opinion to Certificates purchased on the secondary market, counsel for plaintiffs attempted to rehabilitate Blum's testimony:

> Q. So my understanding is that eight of the ten deals at issue
> in this case were purchased by Mr. Prusha on the secondary
> market and not on the primary market. So assuming that is
> true, should your testimony be read to suggest that your
> opinions don't apply to those eight deals?
>
> A. No, I don't believe so. I mean, that's a legal question and
> I'm not an attorney. Investors are -- are perfectly -- it's
> perfectly reasonable for an investor to rely on a -- on a
> prospectus and there are period -- you know, periods specified
> in the laws that I will let the lawyers fight about.

(*Id.* at 359-60.) While the garbled response falls far short of providing assurance that Blum's opinion testimony applies to the certificates sold on secondary market, it arguably

suggests some *possible* relevance.  More critically, however, Blum offers no basis for finding relevance in light of his earlier statements unequivocally distinguishing the primary market from the secondary market *and* limiting his opinion to the former.

Accordingly, this motion is GRANTED and Blum's testimony as to the materiality of information contained in the offering documents for the Certificates purchased on the secondary market is excluded.

### F.  MIL No. 6: Exclude the Expert Testimony of Dr. Charles Cowan regarding the CSFB 2005-3 Certificate (dkt. #184)

Defendant further seeks to exclude certain testimony of another of plaintiffs' expert, Dr. Charles Cowan, as it relates to one of the Certificates at issue in this case -- the CSFB 2005-3 Certificate.  Dr. Cowan selected an initial random sample of loans that were representative of the supporting loan group ("SLG") underlying the CSFB 2005-3 Certificate.  That initial sample failed five out of eleven of Cowan's own representative tests.[7]  As a result, Cowan "re-weighted" the sample to "correct" for this issue.  He then provided that final sample to another one of plaintiffs' experts, Steven Butler, to re-underwrite the loans in that sample.  After Butler performed his analysis, Cowan then extrapolated from the final sample of loans to the whole SLG to determine the percentage of "materially defective" loans to a 95% confidence level with a maximum margin of error of +/- 10 percent.  (*See* Pls.' Resp. (dkt. #224) 7.)

Defendants contend that:  (1) Cowan failed to disclose his methodology in re-

---

[7] The variables were FICO score, debt-to-income ratio, LTV ratio, CLTV ratio, note rate, original loan amount, original term, documentation type, property type and loan purpose.  (Cowan Rept. (dkt. #219) ¶ 61.)

weighting the sample "instead relying on nothing more than his say-so"; and (2) the final sample still fails to be representative.  (Def.'s Br. (dkt. #185) 6.)  Based on these flaws, defendant contends that Cowan's testimony on this Certificate is scientifically unreliable and should be excluded.  As for the *first* contention, defendant devotes much of its brief to the initial sample having failed several of the representative tests, but Cowan freely admitted this, explaining in his deposition that he used re-weighing "to make the sample look like the population . . . [and] reduc[e] the variability of the sample."  (*Id.* at 10-11.) Still, defendant criticizes Cowan for never explaining "precisely" why he engaged in re-weighting for the CSFB 2005-3 Certificate and not for the SLGs underlying any of the other Certificates.  (*Id.* at 11.)  While defendant obviously disputes its validity, however, the *reason* Cowan gave for re-weighting could hardly be more straightforward -- the initial sample of the SLG for the CSFB 2005-3 Certificate was not a representative sample.

Next, defendant contends that Cowan failed to disclose his method for reweighting the Certificate, but that argument, too, is contradicted by Cowan's report itself, which discloses that he not only applied a "re-weighting adjustment," but includes the appendices to his report detailing his methodology, which were already provided to Credit Suisse.  (*See* Pls.' Resp. (dkt. #224) 8 (citing Cowan Rept. (dkt. #219) ¶ 62 n.8).)  Moreover, Credit Suisse had the opportunity to, and, indeed, did, question Cowan about re-weighting at his deposition.  (*See id.* at 9 & n.15 (citing Cowan Dep. (dkt. #194) 72-76, 118-20, 125-29, 136-43, 166-69).)  The court, therefore, rejects defendant's first basis for excluding Cowan's testimony, although defendant remains free to cross-examine Cowan about his re-weighting methodology at trial.

As for its *second* contention, defendant argues that Cowan's testimony regarding CSFB 2005-3 is unreliable generally because the final sample still fails the representative testing. In support, defendant simply points to Cowan's own admission that the final sample fails one of the representative tests. (Def.'s Br. (dkt. #185) 12 (citing Cowan Rept. (dkt. #219) ¶ 43 n.56).) Cowan, however, testified at his deposition that failing one or two of the 11 tests would be an expected result and does not indicate the sample is not representative. (Pls.' Resp. (dkt. #224) 15-16 (citing Cowan Dep. (dkt. #194) 133).) Defendant's remedy is again to cross-examine Cowan as to the soundness of his final sample as representative of the loans in the SLG. Accordingly, this motion is DENIED.

### G. MIL No. 7: Exclude Expert Testimony of Steven I. Butler (dkt. #188)

Finally, defendant seeks to exclude the testimony of plaintiffs' expert Steven I. Butler. As described in the context of other *Daubert* challenges, plaintiffs retained Butler as a mortgage-banking expert to "reunderwrite" a sample of loans from the SLGs underlying each of the Certificates at issue. Based on his analysis, Butler opines that more than 60% of the sampled loans were materially defective, meaning that "they either violated applicable underwriting guidelines or deviated from their represented characteristics in a way that materially increased credit risk." (Pls.' Opp'n (dkt. #226) 7.)

Defendant proffers several reasons for striking Butler's testimony. *First*, defendant argues that Butler's testimony is unreliable because he "bases his opinion in whole or in part on the purported absence of a particular document from the file that he reviewed" without knowing, or having any basis to know, whether the document was missing at the time of loan origination or simply was lost from the loan file over the decade that followed

its origination.  (Def.'s Br. (dkt. #189) 10-13.)  As Butler explained in his report, however, the industry-standard practice was to retain all documents considered in approving a loan in the file.  (Pls.' Resp. (dkt. #226) 22 (citing Butler Rept. (dkt. #205) ¶¶ 58, 60, 174).)  Indeed, this was Credit Suisse's own practice.  Certainly, this is a fair basis to criticize Butler's ultimate opinion, but based on industry practice, he had at least *some* basis to assume that the loan was not properly documented at the time of its origination.  *See Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, No. 12-2591-JWL, 2017 WL 235013, at *11 (D. Kan. Jan. 19, 2017) (denying motion to exclude evidence based on same challenge, finding reasonable basis to assume documents were missing at time of origination).  Even if defendant were correct that Butler had *no* basis for this factual assumption, this would be a reason to give the opinion no weight, not to exclude the opinion.  *See Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 2228 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.").  Of course, defense counsel remains free to explore this further in cross-examination but the criticism still goes to weight, not admissibility.[8]

     *Second*, defendant similarly argues that Butler relies on post-origination information

---

[8] In support of this argument, defendant directs the court to *one* example where Butler opined that the origination underwriter failed to obtain a fully complete version of the "VVOE form," but "the file loan's approval noted a cleared condition reflecting that fully complete VVOE must have been present before closing."  (Def.'s Br. (dkt. #189) 12.)  Defendant's own assumption that the original underwriter would have only marked that condition as cleared if the form actually existed in the first instance is itself subject to challenge.

in evaluating the sample loans, thus undermining his opinion that the origination underwriters missed "red flags" in reviewing a mortgage application.  Defendant essentially points to two types of "post" origination information:  (1) information that did not exist at the time of the origination; and (2) information that existed but the underwriter did not have.  As to the former, the court agrees that Butler's reliance on information only gained after the origination of the loan may well undermine his opinion about misrepresentations at the time of the origination.  In its brief, however, defendant only points to a single example of this involving a single loan:  "Butler faulted the underwriter for not discovering the borrower's purchase of a property with first and second liens two days before the loan closed," while acknowledging that "there can be a lag time in information appearing on public-record reports."  (Def.'s Br. (dkt. #189) 14 (citing Butler Dep. (dkt. #196) 286).) Defendant is again free to cross-examine Butler about this one example, but absent more, the court declines to strike Butler's testimony as unreliable.

Indeed, the vast majority of post-origination evidence the parties discuss in their briefing concern evidence that the original underwriter *could* have accessed at the time of the origination of the loan if, at least in plaintiffs' view, he or she had performed sufficient due diligence.  Defendant argues that Butler's list of "red flags" is overbroad, is inconsistent with industry standards and covers instances where the underwriter complied with industry standards, but the borrower made misrepresentations.  Once again, however, these criticisms do not go to the admissibility of Butler's testimony.  Instead, they concern questions as to the weight his opinions should be given in light of:  (1) whether Butler's re-underwriting process demanded more than is required by industry standards for

underwriting at the time; (2) the scope of the representation in the offering documents that the loans "were originated generally in accordance with the [applicable] underwriting criteria"; and (3) whether that representation concerns process only or a promise that the loans within the SLGs met the criteria set forth in the guidelines. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 653 (S.D.N.Y. 2015) (discussing the role of post-origination information in determining whether underwriters complied with industry guidelines). No doubt, these are important questions, but ones the court need not, and will not, address in the context of a motion in limine.

*Third*, defendant contends that Butler's purported "industry standards" are irrelevant and unreliable. Specifically, defendant takes issue with (1) Butler's use of Bureau of Labor Statistics data to assess the reasonableness of stated income loans and (2) the rigor with which Butler and his team applied that data in reviewing loans. Yet again, this is an area defendant may explore in cross-examination, as well as ultimately argue that Butler's standards are too strict and do not reflect industry standards. Defendant has, however, offered no basis for *excluding* Butler's testimony. Moreover, the thrust of defendant's argument concerns the nature and scope of the promise made in offering documents, which is an issue the court will not address in this opinion and order on the parties' motions in limine.

Finally, defendant challenges Butler's comparison of the credit characteristics of each individual loan as listed in the tapes or mortgage loan schedules ("MLS"), with the loan's "true" credit characteristics. (He concluded that the true credit characteristics differed from those in the MLS, approximately 25% of the time.) Defendant contends

that this evidence was irrelevant because the MLS was not used to construct the collateral tables in the prospectus supplements and that, even if it were, the loan characteristics were presented in an aggregate form, not at the individual loan level. (Def.'s Br. (dkt. #189) 20.) In response, plaintiffs argue that a separate promise in the offering documents, representing that the MLS data was accurate, make Butler's MLS findings relevant. (Pls.' Resp. (dkt. #226) 18 (citing language from PSAs and *Mass Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. CIV.A. 11-30039-MGM, 2015 WL 3964560, at * 12 (D. Mass. June 19, 2015) (holding that PSAs were "incorporated by reference into the prospective supplements")).) In the alternative, plaintiffs contend that a reasonable investor would at least read the offering documents as *implicitly* representing that the MLS data was accurate.

As evidenced by the parties' briefing, this challenge similarly concerns a dispute as to the nature and scope of promises made in the offering documents, rather than the content of Butler's opinion. As such, the court will deny this motion as well, and will consider Butler's testimony if the court finds that Credit Suisse made representations about the MLS data at the individual loan level.

Having rejected all of defendant's bases for excluding Butler's testimony, defendant's final motion in limine is DENIED.

## ORDER

IT IS ORDERED that:

1) Plaintiffs CMFG Life Insurance Company, CUMIS Insurance Society and MEMBERS Life Insurance Company's motion in limine no. 1 to admit Credit Suisse's RMBS settlement agreement with the Department of Justice (dkt. #173) is GRANTED as set forth above.

2) Plaintiffs' motion in limine no. 2 to exclude the expert testimony of William N. Goetzmann, Ph.D. (dkt. #176) is GRANTED IN PART as to Goetzmann's first regression analysis and DENIED IN PART as to his second regression analysis and macroeconomic conditions.

3) Plaintiffs' motion in limine no. 3 to exclude evidence of post-transaction loss causation (dkt. #179) is DENIED as set forth above.

4) Defendant Credit Suisse Securities (USA) LLC's omnibus motions in limine (dkt. #186) are

   a) motion in limine no. 1 is DENIED as set forth above;

   b) motion in limine no. 2 is DENIED as set forth above;

   c) motion in limine no. 3 is DENIED, except that the court will ignore any statement by individuals in the report for the truth of the matter asserted; and

   d) motion in limine no. 4 is DENIED.

5) Defendant's motion in limine no. 5 to partially exclude the expert testimony of Leonard A. Blum (dkt. #182) is GRANTED as set forth above.

6) Defendant's motion in limine no. 6 to exclude the expert testimony of Dr. Charles Cowan regarding the CSFB 2005-3 certificate (dkt. #184) is DENIED.

7) Defendant's motion in limine no. 7 to exclude expert testimony of Steven I. Butler (dkt. #188) is DENIED.

Entered this 23rd day of October, 2017.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge